**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Dale Belli, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 -cv- 243 |
| | ) | |
| Logisys Inc. and | ) | **Jury Trial Requested** |
| Beltmann Group Incorporated, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

NOW COMES the Plaintiff Dale Belli ("Plaintiff"), by and through his undersigned

attorneys and for his Complaint against the Defendants, Logisys Inc., and  Beltmann Group

Incorporated, d/b/a Beltmann Integrated Logistics (hereinafter referred to collectively as

"Beltmann"), states as follows:

**NATURE OF ACTION**

1.      This is a wrongful termination and retaliation case against Beltmann for

illegally terminating Plaintiff because of his disability in violation of the Americans with

Disabilities Act, 42 U.S.C. §12101, et seq., Section 504 of the Rehabilitation Act of 1973,

as amended, at 29 U.S.C. §794 (the "ADA"), for illegally retaliating against him by

terminating him because he requested a reasonable accommodation for his disability under

the ADA, for failing to provide a reasonable accommodation to him based on his disability

in violation of the ADA, and for retaliating against him because he exercised his rights

under the Family and Medical Leave Act, 29 U.S.C. 2601, *et seq.* (the "FMLA") by

requesting family/medical leave time off.

## JURISDICTION AND VENUE

2.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which states that federal courts have primary jurisdiction over actions that arise under the laws of the United States.

3.      Venue lies in the Northern District of Illinois because Plaintiff is a resident of this District, Beltmann was engaged in business in this District, and the events giving rise to the claims alleged in this Complaint occurred in this District.

## PARTIES

4.      Plaintiff Dale Belli ("Plaintiff") is a resident of Schaumburg, Illinois, and worked as a Transportation Coordinator in Beltmann's offices at 1225 Greenbriar Dr., Suite M, Addison, Illinois, from August 3, 2015 until he was terminated by Beltmann on April 23, 2018.

5.      Beltmann is a nationwide transportation, distribution, logistics and project management company qualified and doing business in Illinois, including in DuPage County.

6.      At all relevant times, Beltmann was an "employer" and Plaintiff was an "employee" as defined under the ADA (42 U.S.C §12111) in that Beltmann had 15 or more employees in Illinois for each working day in each of the 20 or more calendar weeks during the relevant calendar years.

7.      At all relevant times, Beltmann was an "employer" and Plaintiff was an "eligible employee" as defined under the FMLA (29 U.S.C § 2611) in that Beltmann was and is engaged in an industry or activity affecting commerce and employed 50 or more for each working day during each of 20 or more calendar workweeks within 75 miles of its

Chicago location and Plaintiff was employed by Beltmann for at least 12 months at the location in Addison, Illinois and worked at least 1,250 hours during the 12 months before he requested leave under the FMLA.

8.     At all relevant times, Plaintiff was qualified to perform his job duties with Beltmann and did in fact satisfactorily performed his job duties with Beltmann while employed there.

## PROCEDURAL BACKGROUND

9.     On June 25, 2018, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation. A true and correct copy of that charge is attached hereto as Exhibit A.

10.     On October 31, 2018, the EEOC issued Plaintiff a notice of right to sue, which entitled him to institute a civil action within 90 days of the date of receipt thereof. A true and correct copy of that notice is attached hereto as Exhibit B.

11.     Plaintiff has filed this lawsuit within 90 days of receiving the EEOC's notice of right to sue, thereby fulfilling all conditions precedent to the institution of his claims under the ADA.

## FACTS

### *Background*

12.     On August 3, 2015 Plaintiff began working for Beltmann as a transportation coordinator out of Beltmann's offices at 1225 Greenbriar Dr., Suite M, Addison, Illinois. In that role, Plaintiff initially reported to Operations Director Jillian Chrischilles ("Chrischilles").

13.     At the time Plaintiff was hired, he was one of four Transportation Coordinators. He primarily worked with a set list of customers for which he was responsible, including (i) Multifilm Packaging Corporation for which he spent roughly 35% of his time (contact: Daniel Carey), (ii) Beltmann's internal Hospitality Department for which he spent roughly 20% of his time (contact: Project Logistics Coordinator Bethany Toms), (iii) additional projects supervised by Chrischilles on which he spent roughly 35% of his time, including project-related work for various customers, such as IDX (delivery of fixtures) and Cardinal Health (delivery of CT Scan machines, medical devices, etc.), oftentimes with multi-state deliveries and/or multiple intra-state deliveries; and (iv) various miscellaneous work on which he spent roughly 10% of his time..

14.     Plaintiff was very successful working at Beltmann and performed superbly in his role. For example, at his most recent performance review on September 13, 2016, Chrischilles graded Plaintiff's overall performance as "meets and sometimes exceeds expectations" and recommended a three-percent merit raise at that time. Though Chrischilles knew at this time that Plaintiff had stage 4 kidney cancer, Plaintiff's cancer had not progressed and was stable at the time.

*Discrimination and Retaliation*

15.     Things changed dramatically in summer 2017. Specifically, on June 30, 2017, Plaintiff's oncologist's office (Dr. Edwin Priest) called him around 4:00 pm and instructed him to go immediately to the nearest emergency room. Dr. Priest said that some abnormalities were detected in Plaintiff's most recent routine blood test as part of his cancer treatment plan. Dr. Priest added that there was a possibility that the chemotherapy medication that Plaintiff had been taking to treat his kidney cancer was causing acute

4

problems with his gallbladder that required immediate attention. Thus, as soon as Plaintiff got off the phone with Dr. Priest, he quickly went to Chrischilles' office and told her: "I just got a call from my oncologist's office and they said that something in my blood test showed that there was something wrong with my gallbladder and that I needed to go to an emergency room immediately." Chrischilles permitted Plaintiff to leave work an hour early to go to the emergency room.

16.     In the days that followed, several things happened: Plaintiff's doctors attempted unsuccessfully to remove his gallbladder; Plaintiff updated Chrischilles on Plaintiff's condition; Beltmann's HR department emailed Plaintiff about using PTO/FMLA to cover his hospital stay; on July 7, 2017, Plaintiff emailed Chrischilles and gave her a one-week update on Plaintiff's hospital stay; and, on July 10, 2017, Chrischilles replied to Plaintiff's email and wrote: "[M]ake sure to keep me informed of all status updates, etc. as things progress." Plaintiff was discharged from the hospital on the evening of Monday, July 10, 2017 and recovered at home until August 18, 2017.

17.     On Friday, August 18, 2017, Plaintiff called Chrischilles to let her know that he would be returning to work on Monday, August 21, 2018. Plaintiff told her that, for the first week, he was to work only 4-6 hours a day per his doctor's recommendation. Chrischilles was livid at hearing this. Thus, instead of welcoming Plaintiff back to work, Chrischilles curtly blurted out: "We don't have any part time positions here." Then, after expressing her disbelief at hearing that Plaintiff was not going back to work full time, Chrischilles told Plaintiff: "I just can't trust you to be here."

18.     When Chrischilles said that she could not trust Plaintiff "to be here," she was not referring to Plaintiff's performance. Rather, she clearly was referring to whether

5

Plaintiff's medical condition would cause him not "to be [t]here" full-time in the future (which it already had done for a month and a half from early July 2017 to mid-August 2017).

19.     Even though Chrischilles didn't "trust" him "to be there" in light of his medical condition and FMLA absences, Chrischilles told Plaintiff that he probably could do some filing work for Asset Recovery Head Joel Gray when he got back on August 21, 2017.

20.     On August 21, 2017, Plaintiff returned to work. Upon his return, Plaintiff immediately checked in with his supervisor, Chrischilles. In a dismissive manner, Chrischilles curtly said: "Ok, you can go file with Joel." It should be noted that this clearly was a *de facto* position demotion. "Filing with Joel" meant that Plaintiff – who is a seasoned professional with over 30 years in the logistics business – was demoted to a position of sifting through old file cabinets, looking for paper photocopies of credit cards in files where the credit card was no longer valid (*i.e.*, the expiration date on the photocopy of the credit card was before August 21, 2017), and then tossing those pieces of paper in a pile to give to the company's shredder. This was a humiliating task and was designed to punish Plaintiff not only for taking FMLA and ADA time off for his disability but also for leaving Chrischilles to figure out how to "pick up the slack" during Plaintiff's approved FMLA absence and asking for a 4-6-hour limitation his first week back.

21.     Despite Chrischilles *de facto* demotion of Plaintiff, Plaintiff did not complain and simply did what he was told to do by Chrischilles. He was truly worried that if he had said anything, Chrischilles would fire him on the spot. Thus, for his first whole work week back (August 21-25), Plaintiff worked out of his cubicle – which is very close

to Chrischilles' office – sifting through papers and looking for expired credit card photocopies to shred. At the end of that week, Plaintiff told Chrischilles that he was done with the "shredding project" and that he intended to return full time and to performing his old job at the TM Group. In other words, Plaintiff told Chrischilles that he was ready to resume his old job as of August 28, 2017.

22.      After acknowledging Plaintiff's desire to return to his old job, Chrischilles then shockingly proclaimed: "You're not going to get your old customers back because I can't trust you to be here." As explained above, Chrischilles' complaint that she could not "trust" Plaintiff "to be here" has nothing to do with his performance; rather, it has everything to do with the fact that Plaintiff's disability and serious medical and approved FMLA leave caused him not "to be here." And Chrischilles' "trust" issues have everything to do with her fears of a third medical-related absence.

23.      Because Chrischilles could not "trust" Plaintiff "to be [there]," she tried her best to starve Plaintiff of work in a transparent attempt to drive him out of the company as she could no longer trust him "to be here" anymore in light of his medical condition and medical-related absences. To illustrate the point, before Plaintiff's disability and medical issue and approved FMLA time off, Plaintiff spent his time in roughly the following fashion: 35% for Multifilm; 20% for Beltmann's internal Hospitality Department; 35% doing project-based work for Chrischilles for customers such as IDX and Cardinal Health; and 10% doing other miscellaneous work. Yet, after Plaintiff returned to work full time, Chrischilles starved him of work over which she had control: She refused to give him his old Multifilm work back (-35%) and no longer gave him the project-based work that she once did before Plaintiff got sick (-35%). In other words, Chrischilles was clearly trying to

dry up Plaintiff's work and make him unnecessary by refusing to let him do roughly 70% of the work he used to do before his disability absences and medical emergency and FMLA absence.

24.     Chrischilles had less control over Plaintiff's work for Beltmann's internal Hospitality Department (20%). For example, the Hospitality Division sent mass emails to the entire TM Group, including Plaintiff, requesting help with delivery/pickup quotes. Being starved from work from Chrischilles, Plaintiff tried to keep himself as busy as possible by quickly replying "I got it" to these mass emails in order to claim the work and keep himself busy working up the quotes. This work was sporadic: sometimes the Hospitality Division would request three quotes in a single day, and other times there were no quote requests for a couple days. It would have been too risky to Chrischilles' covert plan to get rid of Plaintiff for her to have formally instructed the Hospitality Division to remove Plaintiff from its mass emailing list.

25.     Over the next eight months, Chrischilles' conduct toward Plaintiff was consistent with her covert plan. After Plaintiff returned to work (and until he was fired), Chrischilles essentially ignored Plaintiff despite the fact that Plaintiff was one of her direct reports. Chrischilles continued to secretly dry up work for Plaintiff and ignore him in a clumsy effort to drive him out of the company. But Plaintiff did not leave.

26.     Over time, when Plaintiff did not leave voluntarily, Chrischilles started the process of trying to convert her lack-of-trust statements about Plaintiff's medical-related absences into a new lack-of-trust story about Plaintiff's supposed performance-related errors. For example, during a November 2017 meeting (which was attended by VP of Operations Mick Douglas), Chrischilles told Plaintiff: "I really can't trust you because of

some mistakes and some errors." Yet, when Plaintiff asked what mistakes Chrischilles was referring to at the meeting, Chrischilles seemed bewildered and oddly said that she could not think of any off the top of her head (even though this was apparently a meeting that she had requested to discuss Plaintiff's performance).

*Termination*

27.     Chrischilles' new lack-of-trust story was a completely made-up one. To find out why Chrischilles did not "trust" Plaintiff, one need only go back to Chrischilles' first statement on the issue which clearly does not relate to a lack of trust in Plaintiff's performance. Rather, Chrischilles' initial statement on the issue clearly relates to a lack of trust for Plaintiff "to be here" (*i.e.*, to show up to work in light of his medical condition and past FMLA absence).

28.     After Chrischilles stumbled to recount even one single specific instance of Plaintiff committing an error or mistake during the November 2017 meeting, Mr. Douglas, who himself started looking very worried, awkwardly blurted out in a nervous fashion: "I guess it was our bad. I guess we dropped the ball on not confronting you with these issues. Going forward we will try to work things out." After Mr. Douglas said this, Plaintiff assumed that things would go back to normal to the way it was before his medical condition and FMLA absence.

29.     But Plaintiff's assumption was wrong. On Thursday, April 19, 2018, Mr. Douglas and Chrischilles called a meeting to again discuss Chrischilles' lack-of-trust issues with Plaintiff in light of his supposed "errors" and "mistakes." After hearing he was allegedly making all these "errors" and "mistakes" that were supposedly causing him to lose Chrischilles' trust, Plaintiff politely asked what mistakes and/or errors the two were

referring to. He received nothing but silence. As before, neither Mr. Douglas nor Chrischilles could articulate at the meeting a single specific mistake or error that Plaintiff made. Indeed, when the discussion turned to specifics, Mr. Douglas appeared so visibly uncomfortable with having to point to one single example of a mistake or error that he abruptly halted the meeting and said that they could pick up the meeting the next Monday. Not surprisingly, Plaintiff was terminated during the Monday meeting.

30.    As a result of Beltmann's conduct, Plaintiff has suffered loss of wages and benefits, as well as severe emotional distress.

## COUNT I

## ADA - Disparate Treatment/Termination

31.    Plaintiff hereby incorporates in this count the other paragraphs in this complaint as if fully set forth herein.

32.    At all relevant times, Plaintiff was an individual with a "disability" and/or was considered to have a "disability," as that term is defined in the ADA, as a result of his kidney cancer.

33.    Plaintiff had a physical or mental impairment that substantially limited one or more of his major life activities – including but not limited to his ability to sit for prolonged periods of time, to stand, drive a vehicle, to lift objects of a certain weight and otherwise function – had a record of such impairment, and was regarded as having such an impairment.

34.    Plaintiff was qualified to perform the essential functions of his job as a transportation coordinator with or without a reasonable accommodation.

35.     Plaintiff's similarly-situated employees who did not have and were not regarded as having a disability were treated more favorably than Plaintiff, as they were not terminated because of their disability.

36.     Beltmann terminated Plaintiff because of his disability.

37.     As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has suffered great mental anguish, humiliation, degradation, emotional distress, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses, and other consequential damages.

WHEREFORE, Plaintiff prays that this Court:

a.     Enter judgment in favor of Plaintiff and against Beltmann for violation of Plaintiff's rights under the ADA,

b.     Declare that the actions of Beltmann were discriminatory,

c.     Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress,

d.     Award Plaintiff punitive damages in such amount as the Court deems proper,

e.     Award Plaintiff his costs, attorneys' fees and non-taxable expenses in this action, and

f.     Grant Plaintiff such other and further relief as the Court deems equitable and just.

## COUNT II

### Retaliation in Violation of the ADA

38.     Plaintiff hereby incorporates in this count the other paragraphs in this complaint as if fully set forth herein.

39.     At all relevant times, Plaintiff was an individual with a "disability" and/or was considered to have a "disability," as that term is defined in the ADA, as a result of his kidney cancer.

40.     Plaintiff had a physical or mental impairment that substantially limited one or more of his major life activities including but not limited to his ability to sit for prolonged periods of time, to stand, drive a vehicle, to lift objects of a certain weight and otherwise function. Plaintiff was qualified to perform the essential functions of his job as a transportation coordinator with or without a reasonable accommodation.

41.     Plaintiff requested reasonable accommodations to his disability, following which Beltmann retaliated against him by terminating him after he made these requests.

WHEREFORE, Plaintiff prays that this Court:

Enter judgment in favor of Plaintiff and against Beltmann for violation of Plaintiff's rights under the ADA;

   a. Declare that the actions of Beltmann were discriminatory;

   b. Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress;

   c. Award Plaintiff punitive damages in such amount as the Court deems proper;

d.    Award Plaintiff his costs, attorneys' fees and non-taxable expenses in this action; and

e.    Grant Plaintiff such other and further relief as the Court deems equitable and just.

## COUNT III

### Violation of the ADA - Failure to Accommodate/Termination

42.    Plaintiff hereby incorporates in this count the other paragraphs in this complaint as if fully set forth herein.

43.    At all relevant times, Plaintiff was an individual with a "disability" and/or was considered to have a "disability," as that term is defined in the ADA, as a result of his kidney cancer.

44.    Plaintiff had a physical or mental impairment that substantially limited one or more of his major life activities including but not limited to his ability to sit for prolonged periods of time, to stand, drive a vehicle, to lift objects of a certain weight and otherwise function, had a record of such impairment, and was regarded as having such an impairment. Plaintiff was qualified to perform the essential functions of his job as a transportation coordinator with or without a reasonable accommodation.

45.    The ADA prohibits an employer from discriminating against an individual based upon his disability.

46.    The ADA requires an employer to provide reasonable accommodations to its disabled employees.

47.    Following his June 30, 2017 call from his oncologist , and up and until his termination on April 23, 2018, Plaintiff made requests for reasonable accommodations in

the form of time off from work and part-time work supported by physician's medical limitations notes and personal requests, thereby asking Beltmann to make reasonable accommodations with respect to his disability.

48.     Beltmann refused these requests by ultimately terminating Plaintiff on April 23, 2018.

49.     Plaintiff's requested accommodations were reasonable, would not have been unduly burdensome for Beltmann, and could have been accommodated but for Beltmann's bad faith.

50.     As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has suffered great mental anguish, humiliation, degradation, emotional distress, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses, and other consequential damages.

WHEREFORE, Plaintiff prays that this Court:

a.     Enter judgment in favor of Plaintiff and against Beltmann for violation of Plaintiff's rights under the ADA,

b.     Declare that the actions of Beltmann were discriminatory,

c.     Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress,

d.     Award Plaintiff punitive damages in such amount as the Court deems proper,

e.     Award Plaintiff his costs, attorneys' fees and non-taxable expenses in this action, and

     f.     Grant Plaintiff such other and further relief as the Court deems equitable and just.

## COUNT IV

### Retaliation in Violation of Family and Medical Leave Act

51.    Plaintiff hereby incorporates in this count the other paragraphs in this complaint as if fully set forth herein.

52.    Plaintiff requested FMLA leave on or about June 30, 2017, when he left work to attend an emergency doctor's appointment and requested subsequent time off related to kidney cancer.

53.    On or about April 23, 2018, Beltmann terminated Plaintiff in retaliation for requesting leave under the FMLA.

54.    As a consequence of Beltmann's actions, Plaintiff has suffered and continues to suffer damages in the form of lost wages, benefits and compensation plus interest.

55.    Pursuant to the FMLA, Plaintiff is also entitled to recover liquidated damages and his attorneys' fees in pursuing this claim.

56.    WHEREFORE, the Plaintiff, respectfully requests this Honorable Court enter Judgment for the Plaintiff and award Plaintiff the following damages:

     a.     Back wages, health insurance coverage, benefits and other compensation lost as a result of Beltmann's violation of the FMLA;

     b.     Front pay;

     c.     Interest;

d.     Statutory damages in the maximum amount permitted by the Family

Medical Leave Act; and

e.     Attorneys' fees and costs in pursuing her claim.


<u>JURY DEMAND</u>

Plaintiff hereby demands trial by jury on all issues herein.


Respectfully submitted,
DALE BELLI

By: <u>/s/ Michael A. Faccenda</u>
        One of His Attorneys

Michael A. Faccenda
901 West Hillgrove Avenue
La Grange, IL 60525
Phone: 708-497-3077
Email: <u>maf@connorsfaccenda.com</u>
ARDC No. 6239317


By: <u>/s/ Christopher P. Connors</u>
        One of His Attorneys

Christopher P. Connors
901 West Hillgrove Avenue
La Grange, IL 60525
Phone: 312-994-2411
Email: <u>cpc@connorsfaccenda.com</u>
ARDC No. 6269559

**EXHIBIT A**

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☑ EEOC | 440-2018-06233 |

Illinois Department of Human Rights                    and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Dale Belli | 224-659-9661 | 07/30/1955 |

| Street Address | City, State and ZIP Code |
|---|---|
| 872 Suffield Terrace, Schaumburg, IL 60193 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Beltmann Logistics / Logisys, Inc. | Over 50 | 800-859-4440 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1225 Greenbriar Dr., Suite M, Addison, IL 60101 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☑ RETALIATION  ☐ AGE  ☑ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 06/30/2017   Latest: 04/23/2018

☑ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was subjected to illegal discrimination by my former employer Beltmann Group Incorporated / Logisys Inc. ("Beltmann") in that I was terminated because of my disability (i.e., kidney cancer and complications thereof) and because I requested a reasonable accommodation for my disability in violation of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq., Section 504 of the Rehabilitation Act of 1973, as amended, at 29 U.S.C. §794 (the "ADA"). Moreover, Beltmann failed to provide me with a reasonable accommodation in violation of the ADA. Beltmann's reason for terminating me (i.e., performance) is nothing more than a pre-textual assertion meant to conceal the true purpose behind my termination. Below are the details.

1. BACKGROUND

As background, on July 24, 2015, I was offered (and later accepted) a "Transportation Coordinator" position from "LogiSys Inc. d/b/a Beltmann Integrated Logistics." On August 3, 2015, I started working for Beltmann out of its offices at 1225 Greenbriar Dr., Suite M, Addison, Illinois (which is where I continued to work until I ultimately was fired). In that role, I reported initially to Operations Manager Steve Michuda, then to VP of Operations Mick Douglas, and then to Transportation Operations Director Jillian Chrischilles.

When I started working there, I was one of four Transportation Coordinators. I primarily worked with a set list of customers for which I was responsible, including (i) Multifilm Packaging Corporation for which I spent roughly 35% of my

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6-21-18 *(Date)*  *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☑ EEOC | |

| Illinois Department of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

time (contact: Daniel Carey), (ii) Beltmann's internal Hospitality Department for which I spent roughly 20% of my time (contact: Project Logistics Coordinator Bethany Toms), (iii) additional projects supervised by Ms. Chrischilles on which I spent roughly 35% of my time, including project-related work for various customers, such as IDX (delivery of fixtures) and Cardinal Health (delivery of CT Scan machines, medical devices, etc.), oftentimes with multi-state deliveries and/or multiple intra-state deliveries; and (iv) various miscellaneous work on which I spent roughly 10% of my time. I would assist in arranging the logistics for any move the customer desired, including getting quotes for jobs, locating a carrier, booking the load, following up with the dispatcher, tracking the delivery status, and communicating with the customer about the delivery.

I was very successful at Beltmann and performed superbly in my role. Indeed, at my most recent performance review on September 13, 2016, Ms. Chrischilles graded my overall performance as "meets and sometimes exceeds expectations" and recommended a three-percent merit raise at that time. Though Ms. Chrischilles knew at this time that I had stage 4 kidney cancer, my cancer had not progressed and was stable at the time.

2. DISCRIMINATION AND RETALIATION

Things changed dramatically in summer 2017. Specifically, on June 30, 2017, my oncologist (Dr. Edwin Priest) called me around 4:00 pm and instructed me to go immediately to the nearest emergency room. Dr. Priest said that some abnormalities were detected in my most recent routine blood test as part of my cancer treatment plan. Dr. Priest added that there was a possibility that the chemotherapy medication that I had been taking to treat my kidney cancer was causing acute problems with my gallbladder that required immediate attention. Thus, as soon as I got off the phone with Dr. Priest, I quickly went to Ms. Chrischilles' office and told her: "I just got a call from my oncologist's office and they said that something in my blood test showed that there was something wrong with my gallbladder and that I needed to go to an emergency room immediately." Ms. Chrischilles permitted me to leave work an hour early to go to the emergency room.

In the days that followed, several things happened: my doctors attempted unsuccessfully to remove my gallbladder; my wife updated Ms. Chrischilles on my condition; Beltmann's HR department emailed me about using PTO/FMLA to cover my hospital stay; on July 7, 2017, my wife emailed Ms. Chrischilles and gave her a one-week update on my hospital stay; and, on July 10, 2017, Ms. Chrischilles replied to my wife's email and wrote: "[M]ake sure to keep me informed of all status updates, etc. as things progress." I was discharged from the hospital on the evening of Monday, July 10, 2017 and recovered at home until August 18, 2017.

On Friday, August 18, 2017, I called Ms. Chrischilles to let her know that I would be returning to work on Monday, August 21, 2018. I told her that, for the first week, I was to work only 4-6 hours a day per my doctor's recommendation. Ms. Chrischilles was livid at hearing this. Thus, instead of welcoming me back to work, Ms. Chrischilles curtly blurted out to me: "We don't have any part time positions here." Then, after expressing her disbelief at hearing that I was not going back to work full time, Ms. Chrischilles told me: "I just can't trust you to be here."

When Ms. Chrischilles said that she could not trust me "to be [t]here," she was not referring to my performance. Rather, she clearly was referring to whether my medical condition would cause me not "to be [t]here" full-time in the future

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6-21-18 _____  _Dale Beli_____ <br> Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☑ EEOC | |

| Illinois Department of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

(which it already had done for a month and a half from early July 2017 to mid-August 2017). That is the only reasonable inference that can be drawn from her statement.

Even though Ms. Chrischilles didn't "trust" me "to be [t]here" in light of my medical condition and FMLA absences, Ms. Chrischilles told me that I probably could do some filing work for Asset Recovery Head Joel Gray when I got back on August 21, 2017.

On August 21, 2017, I returned to work. Upon my return, I immediately checked in with my supervisor, Ms. Chrischilles. In a dismissive manner, Ms. Chrischilles curtly said: "Ok, you can go file with Joel." It should be noted that this clearly was a de facto position demotion. "Filing with Joel" meant that I – a seasoned professional with over 30 years in the logistics business – was demoted to a position of sifting through old file cabinets, looking for paper photocopies of credit cards in files where the credit card was no longer valid (i.e., the expiration date on the photocopy of the credit card was before August 21, 2017), and then tossing those pieces of paper in a pile to give to the company's shredder. This was a completely humiliating task and was designed to punish me not only for my disability and for taking FMLA time off for my disability but also for leaving Ms. Chrischilles to figure out how to "pick up the slack" during my approved FMLA absence and asking for a 4-6-hour limitation my first week back.

Despite my de facto demotion by Ms. Chrischilles, I did not complain and simply did what I was told to do by Ms. Chrischilles. I was truly worried that if I had said anything, Ms. Chrischilles would fire me on the spot. Thus, for my first whole work week back (August 21-25), I worked out of a cubicle in Asset Recovery – which is very close to Ms. Chrischilles' office – sifting through papers and looking for expired credit card photocopies to shred. At the end of that week, I told Ms. Chrischilles that I was done with the "shredding project" and that I intended to return full time and to performing my old job at the TM Group. In other words, I told Ms. Chrischilles that I was ready to resume my old job as of August 28, 2017.

What happened next was horrible (yet predicable) given how Ms. Chrischilles reacted when she first learned on August 18, 2017 that I was coming back. After acknowledging my desire to return to my old job, Ms. Chrischilles shockingly proclaimed: "You're not going to get your old customers back because I can't trust you to be here." As explained above, Ms. Chrischilles' complaint that she could not "trust" me "to be [t]here" has nothing to do with my performance; rather, it has everything to do with the fact that my serious medical and approved FMLA leave cause me not "to be [t]here." And Ms. Chrischilles' "trust" issues have everything to do with her fears of a third medical-related absence caused by my disability.

Because Ms. Chrischilles could not "trust" me "to be [there]," she tried her best to starve me of work in a transparent attempt to drive me out of the company as she could no longer trust me "to be [t]here" anymore in light of my medical condition and medical-related absences. To illustrate the point, before my medical issue and approved FMLA time off, I spent my time in roughly the following fashion: 35% for Multifilm; 20% for Beltmann's internal Hospitality Department; 35% doing project-based work for Ms. Chrischilles for customers such as IDX and Cardinal Health; and 10% doing other miscellaneous work. Yet, after I returned to work full time, Ms. Chrischilles starved me of work over which she had control: She refused to give me my old Multifilm work back (-35%) and no longer gave me the project-based work that she once did before I got sick (-35%). In other words, Ms. Chrischilles was clearly trying to dry up my work and make

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 6-21-18 _____<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☑ EEOC | |

| Illinois Department of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

me unnecessary by refusing to let me do roughly 70% of the work I used to do before my medical emergency and FMLA absence.

Ms. Chrischilles had less control over my work for Beltmann's internal Hospitality Department (20%). For example, the Hospitality Division sent mass emails to the entire TM Group, including me, requesting help with delivery/pickup quotes. Being starved from work from Ms. Chrischilles, I tried to keep myself as busy as possible by quickly replying "I got it" (or something similar) to these mass emails in order to claim the work and keep myself busy working up the quotes. This work was sporadic; sometimes the Hospitality Division would request three quotes in a single day, and other times there were no quote requests for a couple days. It would have been too risky to Ms. Chrischilles' covert plan to get rid of me for her to have formally instructed the Hospitality Division to remove me from its mass emailing list.

Over the next eight months, Ms. Chrischilles' conduct toward me was consistent with her covert plan. After I returned to work (and until I was fired), Ms. Chrischilles essentially ignored me despite the fact that I was one of her direct reports. Ms. Chrischilles continued to secretly dry up work for me and ignore me in a clumsy effort to drive me out of the company. But I did not leave.

Over time, when I did not leave voluntarily, Ms. Chrischilles started the process of trying to convert her lack-of-trust statements about my medical-related absences into a new lack-of-trust story about my supposed performance-related errors. For example, during a November 2017 meeting (which was attended by VP of Operations Mick Douglas), Ms. Chrischilles told me: "I really can't trust you because of some mistakes and some errors." Yet, when I asked what mistakes Ms. Chrischilles was referring to at the meeting, Ms. Chrischilles seemed bewildered and oddly said that she could not think of any off the top of her head.

Ms. Chrischilles' new lack-of-trust story was a completely made-up one. To find out why Ms. Chrischilles did not "trust" me, one need only go back to Ms. Chrischilles' first statement on the issue which clearly does not relate to a lack of trust in my performance. Rather, Ms. Chrischilles' initial statement on the issue (and most honest one) clearly relates to a lack of trust for me "to be [t]here" (i.e., to show up to work in light of my medical condition). Nothing is more revealing about Ms. Chrischilles' motive to illegally get rid of me than Ms. Chrischilles' own words.

After Ms. Chrischilles stumbled to recount even one single specific instance of me committing an error or mistake during the November 2017 meeting, Mr. Douglas awkwardly blurted out: "I guess it was our bad. I guess we dropped the ball on not confronting you with these issues. Going forward we will try to work things out." After Mr. Douglas said this, I assumed that things would go back to normal to the way it was before my medical condition and absence.

But my assumption was wrong. On Thursday, April 19, 2018, Mr. Douglas and Ms. Chrischilles called a meeting to again discuss Ms. Chrischilles' supposed "lack-of-trust" issues with me in light of my supposed "errors" and "mistakes." After hearing Ms. Chrischilles' claims that I was allegedly making all these "errors" and "mistakes" that were supposedly causing me to lose Ms. Chrischilles' trust, I politely asked what mistakes and/or errors the two were referring to. Nothing but silence. As before, neither Mr. Douglas nor Ms. Chrischilles could articulate at the meeting a single specific mistake or error that I made. Indeed, when the discussion turned to specifics, Mr. Douglas appeared so frustrated with having to point to one single example of a mistake or error that he abruptly halted the meeting and said that they could pick up the

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6-21-18     _Dali Belli_ <br> Date           Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☑ EEOC | |

| Illinois Department of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

meeting the next Monday. Not surprisingly, I was terminated during the Monday meeting.

In short, I was a very loyal, professional, hard-working, and well-performing employee at Beltmann and had been so since I started working there in mid-2015. That all changed in late June 2017 when my kidney cancer caused complications that required me to take FMLA time off. When I returned from my approved FMLA absence, things were never the same. I was starved of work because, in Ms. Chrischilles' own words, she could not "trust [me] to [physically] be [t]here" because of my medical condition. Ms. Chrischilles clearly hoped that I would "get the message" and quit on my own. But, when I did not, Ms. Chrischilles converted her initial and medically-related "lack-of-trust" story into an ostensibly legitimate -- but false -- "lack-of-trust" story (alleged mounting errors/mistakes) and thereby fabricated a reason to get rid of me involuntarily. Simply put, Ms. Chrischilles' true motive for driving me out of the company was my disability and my exercise of my rights under the FMLA, which is completely illegal.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6-21-18 Date      Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EXHIBIT B

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Dale Belli**<br>**c/o Michael A. Faccenda, Esq.**<br>**Connors & Faccenda**<br>**901 W. Hillgrove Ave.**<br>**La Grange, IL 60525** | From: **Chicago District Office**<br>**500 West Madison St**<br>**Suite 2000**<br>**Chicago, IL 60661** |

|   | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2018-06233** | **Gregory T. Mucha,**<br>**Investigator** | **(312) 869-8135** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

|   | More than 180 days have passed since the filing of this charge. |
|---|---|
| **X** | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| **X** | The EEOC is terminating its processing of this charge. |
|   | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

|   |   |
|---|---|
| **X** | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost. |
|   | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

**Julianne Bowman,**
**District Director**

10/31/18
*(Date Mailed)*

Enclosures(s)

cc: **BELTMANN LOGISTICS**
**c/o Kristen A. Cemate, Esq.**
**O'Hagan, Meyer Law Firm**
**One East Wacker Drive**
**Suite 3400**
**Chicago, IL 60601**